# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **NAKISHA RODDY,** | ) |
| Plaintiff, | ) |
| v. | ) No. 3:20-cv-00373 |
| **TENNESSEE DEPARTMENT OF CORRECTIONS,** | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

On August 22, 2019, Roddy complained to her supervisor about alleged racial discrimination she faced from her white coworkers at Riverbend Maximum Security Institution ("RMSI"), a facility operated by the Tennessee Department of Corrections ("TDOC"). Less than two hours later, a TDOC investigator confronted Roddy, accusing her of smuggling contraband into the facility. The investigator's findings prompted RMSI's warden to immediately ban Roddy from RMSI and factored heavily into Roddy's employment agency's decision to fire her two months later. This timeline certainly sounds in retaliation. Likely for that reason, Roddy brought identical retaliation claims against TDOC under the Tennessee Human Rights Act (the "THRA") and Title VII of the Civil Rights Act of 1964 ("Title VII"), which allow individuals to bring such claims against their employers and those who stand in the place of employers. But neither Roddy, her supervisor, nor her coworker were TDOC employees. What's more, Roddy has offered nothing to show that any TDOC employee knew about Roddy's complaint when the warden banned her. For the following reasons, the Court will grant TDOC's Motion for Summary Judgment (Doc. No. 54).

I.   **FACTUAL ALLEGATIONS AND BACKGROUND**[1]

In June 2019, Nakisha Roddy accepted an assignment from her employment agency, Maxim Healthcare Services, Inc. ("Maxim"), to work as a nurse at RMSI, a TDOC facility in Nashville, Tennessee. (Doc. No. 65-1 at ¶ 2). The job was not with RMSI or TDOC directly. (Id. at ¶¶ 1–2). Rather, Maxim worked with Centurion of Tennessee, LLC ("Centurion") who provided inmate health services at RMSI and formally employed all of the facility's nursing staff since July 1, 2018. (Id. at ¶ 1).

Though Roddy worked at RSMI, her relationship with TDOC was attenuated. The parties agree that Centurion, rather than TDOC, had the ability to directly hire, fire, and discipline nurses at RMSI, (Doc. No. 65-1 at ¶ 17); to affect the compensation and benefits received by nurses at RMSI, (id. at ¶ 18); and to direct and supervise the performance of the nurses at RSMI. (Id. at ¶ 19).

Roddy's assignment to RMSI began without issue, and, by all accounts, she was a sterling nurse. (Doc. No. 67-1 at 20). However, on August 21, 2019, Roddy and another Maxim/Centurion nurse, Tabitha Miller, had a verbal altercation, which resulted in Roddy and Miller going to their supervisor, Director of Nursing Kyla Solomon. (Doc. No. 65-1 at ¶¶ 3–4). Solomon also worked for Centurion. (Id. at ¶ 5). In front of Solomon, Roddy alleges, Miller compared her to another black nurse and accused of her of being too friendly with inmates. (Doc. No. 67-1 at 20–21). Roddy claims she questioned Solomon about prior issues with Roddy, and Solomon supposedly

---

[1] The facts in this section are undisputed unless specifically noted otherwise and are drawn from the undisputed portions of the parties' statements of facts (Doc. Nos. 65-1, 69), the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing that are not contradicted by the evidence in the record.

2

responded that she had not. (Id. at 20). After Roddy made her case, she was asked to leave the room to allow Miller and Solomon to speak privately. (Id.)

The following day at around 11:00 a.m., Roddy returned to Solomon and explained that she felt that Miller discriminated against her the day before and that other coworkers had made similar comments about how Roddy relates to the inmates better than her white counterparts because of her race. (Doc. No. 69 at ¶¶ 1–2). Roddy requested that Miller apologize, and, according to Roddy, Solomon agreed and promised to speak to Miller when she arrived to work. (Doc. No. 67-1 at 21–22).

Roddy never received that apology. Just two hours later, another nurse told Roddy that Solomon needed to speak with her. (Doc. No. 69 at ¶¶ 3–4; Doc. No. 67-1 at 22). But when Roddy arrived at Solomon's office, she was met by not only Solomon, but also by a male facility officer and TDOC Institutional Investigator Kelly Hunt. (Id. at 22). The male officer left soon after Roddy entered the room. (Id.). Hunt then showed Roddy an image of a body scan of a woman with a large dark mass in her pelvis, (Doc. No. 69 at ¶ 5), and told her that the image was one of her smuggling drugs into the facility. (Doc. No. 65-1 at ¶ 8). According to Hunt's report, the body scan was taken on August 7, 2019 at roughly 6:00 a.m.[2] (Doc. No. 69 at ¶ 8). Roddy denied any wrongdoing and denied that she was the individual in the body scan. (Doc. No. 65-1 at ¶ 9). Hunt continued to press Roddy, challenging Roddy's claim that the object in the body scan was a tampon and asking about her relationships with inmates. (Doc. No. 67-1 at 22). After Hunt finished questioning Roddy, Roddy was escorted from the facility. (Doc. No. 65-1 at ¶ 11). Importantly, Roddy never discussed her allegations of discrimination with Hunt. (Id. at ¶ 10).

---

[2] The investigation summary makes no mention of any investigative steps taken between the day that the body scan took place and Hunt's interview of Roddy. (Doc. No. 66-1 at 1).

Later that day, Hunt relayed her findings to RMSI Warden Tony Mays, and Warden Mays informed Maxim that Roddy was banned from RMSI. (Doc. No. 65-1 at ¶¶ 13–14). This ban, however, did not extend to other TDOC facilities. (Id. at ¶ 14)

Neither Maxim, nor Centurion sought to have Roddy reinstated at RMSI. Maxim staff investigating the matter in the two months that followed indicate that at least some did not believe RMSI's allegations. (See Doc. No. 66-3 at 206 ("I obviously have to comply with whatever decision you guys decide[,] but I just want to go on record that we do not have enough evidence to substantiate the fact that Nakisha Roddy had contraband and entered the prison. The client of course has the right [to] hire and fire at will but we also have an obligation to our employees"). However, Maxim ultimately concluded that RMSI's allegations were likely true. (See id. at 205 ("We make our recommendation based on all the information provided. In this case, there is more reason to believe that she did engage in the misconduct tha[n] that she didn't."). On or about November 1, 2019, Maxim terminated Roddy's employment. (Doc. No. 66-3 at 310).

On May 1, 2020, Roddy filed suit against TDOC, RMSI, and Maxim, alleging that they retaliated against her for complaining about discrimination in violation of Title VII and the THRA. (See generally Doc. No. 1). Now, TDOC is the only remaining defendant. (See Doc. Nos. 6, 42 (dismissing Roddy's claims against RMSI and Maxim)).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The

4

moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

Moreover, if, "after adequate time for discovery and upon motion," the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial[,]" a court should enter summary judgment in favor of the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When this occurs, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323 (citation an internal quotation marks omitted). Conclusory statements "unadorned with supporting facts are insufficient." Viet v. Le, 951 F.3d 818, 823 (6th Cir. 2020). Thus, if the nonmovant does not support the elements of a claim or defense, the moving party is entitled to judgment as a matter of law.

### III.  ANALYSIS

Before addressing the merits of Roddy's retaliation claims under the TRHA and Title VII, the Court can simplify this case by half.  Soon after Roddy filed her initial Complaint (Doc. No. 1), the Court dismissed Roddy's THRA claim against TDOC because it was barred by sovereign immunity.  (Doc. No. 6 at 6).  Roddy later filed her Amended Complaint, which realleged her THRA claim.  (Doc. No. 43 at ¶ 2).  The Court need not reconsider the issue because the "law of the case" is dispositive.  See Samons v. Nat'l Mines Corp., 25 F.4th 455, 463 (6th Cir. 2022) ("The doctrine known as 'law of the case' encapsulates a simple idea: courts generally decline to redecide issues that they have already decided.  Law of the case thus promotes judicial efficiency by prohibiting parties from indefinitely relitigating the same issue that a court resolved in an earlier part of the case.").  Thus, only Roddy's Title VII claim remains.

   A. Roddy's Title VII Claim

      a. TDOC is not Roddy's Employer for Purposes of Title VII.

Often, courts can dispose of Title VII claims where, as here, the record evidence demonstrates that the defendant did not formally employ the plaintiff.  However, the Sixth Circuit has enunciated two theories by which an entity that is not the plaintiff's formal employer falls within the ambit of Title VII: the "joint employer" theory and the Christopher "significantly affects access" theory.  See Nethery v. Quality Care Invs., L.P., 814 Fed. App'x 97, 102–04 (6th Cir. 2020) (analyzing *de novo* whether the plaintiff offered sufficient evidence under either theory to survive summary judgement).

Roddy concedes that TDOC was not her formal employer.  (See generally Doc. No. 65-3 at 3–5 (arguing that TDOC "can be considered a joint employer")).  Thus, at the outset, the Court must determine whether TDOC is subject to Title VII under one or both alternative theories.  In

6

her brief, Roddy raises both theories (though conflating the two)—folding the latter into her argument that TDOC was her joint employer. (See Doc. No. 65-3 at 5 ("Due to Defendant's power in this case to both terminate Plaintiff's access to the facility and to interfere with her access to other employment with the agency, Defendant can be considered a joint employer.")). For clarity's sake, the Court will consider each theory separately.

      i.    The Joint Employer Theory

Under the joint employer theory, "an entity that is not the plaintiff's formal employer may be treated . . . as if it were the employer for the purposes of employment laws such as Title VII." Sanford v. Main St. Baptist Church Manor, Inc., 449 F. App'x 488, 491 (6th Cir. 2011). The Sixth Circuit has made clear that entities are joint employers if they share or co-determine those matters governing essential terms and conditions of employment. EEOC v. Shanska USA Bldg., Inc., 550 Fed. App'x 253, 256 (6th Cir. 2013) (citing Carrier Corp. v. NLRB, 768 F.2d 778, 781 (6th Cir. 1985)). To determine whether an entity is the plaintiff's joint employer, the Court should consider a number of factors including an entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance. Id.

The parties agree that Centurion provided the inmate health services at RMSI and employed all of the nursing staff at RMSI when Roddy accepted the assignment from Maxim. (Doc. No. 65-1 at ¶¶ 1–2). They also agree that Centurion, rather than TDOC, had the ability to directly hire, fire, and discipline nurses at RMSI; to affect the compensation and benefits received by nurses at RMSI; and to direct and supervise the performance of the nurses at RSMI. (Id. at ¶¶ 17–19).

Despite the above concessions, Roddy argues that TDOC was her joint employer because "TDOC [had] the ability to fire Plaintiff" by "banning Plaintiff from the premises [which] directly

7

caused her nursing agency to feel compelled to terminate her employment." (Doc. No. 65-3 at 3). In other words, Roddy argues that the practical impact of TDOC's ban and allegations had on Maxim's decision to fire her is no different than TDOC having the *actual* ability to fire Roddy. (See id. at 4 ("[Maxim] considered Plaintiff's employment to be at the sole mercy of Defendant TDOC who can 'hire and fire at will' as the nursing agency employees stated")).

But the notion that TDOC's alleged indirect power constitutes the "ability to fire" for purposes of joint employer analysis is suspect, and Roddy cites no authority—binding or otherwise—supporting the proposition. (See Doc. No. 65-3 at 3–4).

Regardless, even with every reasonable inference in Roddy's favor, the record evidence does not support Roddy's conclusion that, following her ban, Maxim considered Roddy's employment to "be at the sole mercy of Defendant TDOC." (Doc. No. 65-3 at 3). Roddy concedes that she was terminated by Maxim more than two months after she was banned from the RMSI facility. (Doc. No. 65-1 at ¶¶ 14–15). And, according to her deposition, in the time between the ban and her firing, Roddy spoke to her recruiter about a new assignment and was told that she could not be staffed because Maxim was conducting its own investigation. (Doc. No. 67-1 at 94:14–95:4). The correspondence among Maxim staff investigating the allegations indicates that they knew that the decision to terminate Roddy's employment rested with Maxim. (See Doc. No. 66-3 at 206 ("I obviously have to comply with whatever decision you guys decide[,] but I just want to go on record that we do not have enough evidence to substantiate the fact that Nakisha Roddy had contraband and entered the prison. The client of course has the right [to] hire and fire at will but we also have an obligation to our employees"); see also id. at 205 ("Please know our obligation is to conduct a good faith investigation into an allegation which we did. We make our recommendation based on all the information provided. In this case, there is more reason to believe

8

that she did engage in the misconduct tha[n] that she didn't.")). In short, the record evidence demonstrates that Maxim took a measured and independent approach to investigating the legitimacy of TDOC's accusation—the opposite of what Roddy's novel liability theory requires.

The record evidence also establishes that TDOC had the ability to ban Roddy from any of its facilities—nothing more—and it exercised that ability when it banned Roddy from RMSI. (Doc. No. 65-1 at ¶¶ 13–14). At all relevant times, Maxim maintained the unilateral authority to terminate Roddy, and Maxim and Centurion shared control over virtually every material aspect of her employment. (Id. at ¶¶ 17–19). Based on the forgoing, Roddy has not provided sufficient evidence that TDOC was her joint employer to survive summary judgment.

   ii. The Christopher "Significantly Affects Access" Theory

Distinct from her joint employer theory, Roddy argues that TDOC is subject to Title VII liability because its decision to ban her interfered with her access to other employment opportunities, (Doc. No. 65-3 at 5), a theory that the Sixth Circuit enunciated in Christopher v. Stouder Memorial Hospital, 936 F.2d 870 (6th Cir. 1991). This can be easily discarded.

In Christopher, the Sixth Circuit held that a non-employer may be held liable under Title VII if it significantly affects an individual's access to employment opportunities with third parties. 938 F.2d at 871–72. There, the plaintiff was a nurse who had been hired by a group of physicians to assist them as they performed surgeries at the defendant hospital. Id. After she began working for the physicians, the hospital denied Christopher her practicing privileges, thereby completely preventing her from working with the physicians. Id. Thus, the court reasoned that denying her hospital privileges effectively denied Christopher her employment and allowed a Title VII claim to proceed. Id. at 880.

9

The Sixth Circuit considered and ultimately rejected the Christopher theory's application to facts remarkably similar to those at hand here in Nethery v. Quality Care Investors, L.P., 814 Fed. App'x 97 (6th Cir. 2020). There, a physical-therapist assistant brought a Title VII claim against the operators of a nursing home where she had been staffed ("Quality Care") after she was fired by her formal employer Reliant Management Group, LLC ("Reliant"). Nethery, 814 Fed. App'x at 98–99. According to Nethery, the administrator at the nursing home demanded that she be removed from that specific facility after Nethery's complaints of sexual harassment prompted the firing of another employee. Id. at 98. When applying the Christopher theory, the Sixth Circuit reasoned that "[u]nlike in Christopher, . . . [the defendant] does not stand as an intermediary between the plaintiff and the third party." Id. at 104. Although Quality Care may have affected Nethery's ability to work at Quality Care's Lebanon facility, the court explained, it did not prevent her from working for Reliant at an out-of-state facility. Id. According to the Sixth Circuit, "that distinction makes a difference." Id.

The same reasoning applies here. TDOC certainly affected Roddy's ability to work at RMSI, but it did not prevent her from working at any other TDOC facility. As previously discussed, the record indicates that Maxim staff made the independent decision to fire Roddy. Had Maxim decided otherwise, neither the allegations, nor the ban would have prevented her from working at other Maxim-serviced facilities. Accordingly, Roddy's claim must fail.

B. Roddy Fails to Establish a Prima Facie Case

Even if TDOC could be liable under Title VII, summary judgment would be appropriate because Roddy has not offered sufficient evidence to establish a viable prima facie case. To establish a prima facie case for retaliation under Title VII, an employee must show that (1) she engaged in a protected activity, (2) the employer knew of the exercise of the protected right, (3)

an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action. Laughlin v. City of Cleveland, 633 Fed. App'x 312, 315 (6th Cir. 2015).

TDOC's argument is straightforward; it contends that the record evidence cannot demonstrate the second prong of a Title VII retaliation claim—knowledge.[3] (Doc Nos. 56 at 6, 68 at 4–5). To support its argument, TDOC highlights, among other things, that Roddy admits that she only complained about her alleged discrimination to Solomon, another Centurion employee, (Doc. No. 56 at 6), and that she never informed anyone at TDOC—including Hunt—that she was being discriminated against by her coworkers. (Doc. No. 68 at 4).

In response, Roddy argues that a reasonable jury could infer that Kelly Hunt knew of Roddy's protected activity because of two pieces of circumstantial evidence: (1) Hunt confronted Roddy in the same room that Roddy made her complaint to Solomon and that Roddy and Miller argued in the day prior; and (2) the temporal proximity between Roddy's complaint and Hunt's allegations against her. (Doc. No. 65 at 8 ("[A] reasonable juror could infer that Kelly Hunt was aware of . . . her complaints of discrimination because not only did the allegations arise mere hours after Plaintiff's complaint of discrimination, but Kelly Hunt was waiting on Plaintiff in the office of the nursing agent Plaintiff complained to hours before.")).

To establish knowledge, a plaintiff must provide sufficient evidence to allow an inference that her employer knew of her protected activity when it took the adverse action. Scott v. Eastman

---

[3] In its reply brief, TDOC also argues that the lack of evidence of knowledge also undermines Roddy's ability to establish the fourth prong—a causation connection between the protected action and the adverse employment action. (Doc. No. 68 at 4–5). Because that prong requires Roddy to prove that Hunt knew about her protected activity prior to confronting her, see, e.g., Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 550 (6th Cir. 2008), the Court's reasoning in this section applies equally there.

Chem. Co., 275 Fed. Appx. 466, 482 (2008). In most cases, the employee will be able to produce direct evidence that the decision-making officials knew of the employee's protected activity because the adverse action is often taken by the same supervisor to whom the employee made complaints in the past. Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002). But knowledge may be imputed to the employer when an individual with knowledge was the actual decisionmaker and "driving force behind the employment action." Roberts v. Principi, 283 Fed. App'x 325, 333 (6th Cir.2008). Under these circumstances, "the [retaliator] is the decisionmaker, and the titular decisionmaker is a mere conduit for the [retaliator's] discriminatory animus." Id. (internal quotations and citation omitted); see also Madden v. Chattanooga City Wide Serv. Dep't, 549 F.3d 666, 678 (6th Cir. 2008). Direct evidence of knowledge is not required, and a plaintiff may survive summary judgment by producing circumstantial evidence of her employer's knowledge to establish this element of her claim. Proffitt v. Metro. Gov't of Nashville & Davidson Cnt'y, Tenn., 150 Fed. App'x 439, 443 (6th Cir. 2005). Still, this circumstantial evidence must be more than "conspiratorial theories or flights of fancy, speculations, hunches, intuitions, or rumors." Id. (internal citation and quotations marks omitted)).

Here, although it is plausible that Hunt's knowledge should be imputed on TDOC, Roddy fails to get past the threshold requirement of offering sufficient evidence to show that Hunt knew about Roddy's complaint. The first fact that Roddy points to—that Hunt confronted Roddy in Solomon's office—in no way shows or even permits an inference that Hunt had any knowledge of her complaint. Roddy would have the jury do her work for her and infer that: (1) Solomon told Hunt about Roddy's complaint, and (2) the two then made up the allegations in the few hours between Roddy's complaint and when Hunt confronted Roddy. But these are precisely the type

of speculations and conspiratorial theories that the Sixth Circuit forbids. Proffitt, 150 Fed. App'x at 443. No record evidence supports either of these leaps. Thus, this fact must be set aside.

The only other fact that Roddy marshals to establish knowledge is the temporal proximity between her complaints and Hunt's allegations, but this also does not evince knowledge. Although temporal proximity between a protected activity and an adverse employment action can be used to support a prima facie case for retaliation, it supports the fourth prong of the analysis, causation, rather than knowledge. See Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 550 (6th Cir. 2008) (through knowledge of the complaints coupled with a closeness in time that creates an inference of causation). What's more, temporal proximity in the Title VII context is established using the employer's knowledge—not the other way around. Id. Roddy offers no argument or legal basis to substantiate her position, (Doc. No. 65 at 8), and this Court's independent research has yielded no case that might save her. Indeed, other courts in this circuit have considered and rejected the notion that temporal proximity evinces knowledge. See, e.g., Feltner v. Mike's Trucking, No. 2:12-cv-925, 2014 WL 272446, at *12 (S.D. Ohio Jan. 23, 2014) ("[T]he temporal proximity analysis in the Sixth Circuit requires the employer's knowledge and the adverse employment action to be close in time, not the protected activity. Thus, an independent showing of knowledge is required."). The Court need not break new ground here.

Accordingly, Roddy's prima facie case fails.

## IV. CONCLUSION

For the foregoing reasons, TDOC's Motion for Summary Judgment (Doc. No. 54) will be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE